**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| NAVIENT SOLUTIONS, LLC<br>2001 Edmund Halley Drive<br>Reston, VA 20191,<br><br>          Plaintiff,<br><br>    v.<br><br>KROHN & MOSS, LTD.<br>10 N. Dearborn Street<br>Chicago, IL 60602,<br><br>ADAM KROHN,<br>c/o Krohn & Moss, Ltd.<br>10 N. Dearborn Street<br>Chicago, IL 60602<br><br>ADAM HILL,<br>c/o Krohn & Moss, Ltd.<br>10 N. Dearborn Street<br>Chicago, IL 60602<br><br>LAW OFFICES OF RYAN LEE, PLLC,<br>7272 E. Indian School Rd., Ste. 540<br>Scottsdale, AZ 85251<br><br>RYAN LEE,<br>c/o Law Offices of Ryan Lee, PLLC<br>7272 E. Indian School Rd., Ste. 540<br>Scottsdale, AZ 85251<br><br>NATIONAL CONSUMER ADVOCATES,<br>  INC.,<br>9420 Roseda Blvd.<br>Northridge, CA 91324<br><br>DOUG JOHNSON,<br>8914 Griffith Road<br>Nashville, TN 37221 | CIVIL ACTION No.   1:17-cv-01178  <br><br>JURY TRIAL DEMANDED |

1

MICHAEL B. BIANCONE,
404 Seneca River Rd.
Myrtle Beach, SC 29588

MB INVESTMENTS & CONSULTING,
 LLC,
404 Seneca River Rd.
Myrtle Beach, SC 29588

JOHN DOES # 1–20,

                    Defendants.

## **COMPLAINT**

1.      Plaintiff Navient Solutions, LLC ("NSL") brings this action against Krohn &

Moss, Ltd., Adam Krohn, Adam Hill, the Law Offices of Ryan Lee, PLLC, Ryan Lee, National

Consumer Advocates, Inc., Doug Johnson, Michael B. Biancone, MB Investments & Consulting,

LLC, and John Does # 1–20 for a conspiracy to violate the Racketeer Influenced and Corrupt

Organizations Act ("RICO") through a pattern of mail fraud, wire fraud, and witness tampering,

as well as other tortious acts.

## **Preliminary Statement**

1.      NSL brings this complaint to address a grave abuse of the law by legal

professionals and associated "debt counseling" practitioners. Since at least 2014, Defendants

have operated as an association in fact to carry out a scheme (the "Scheme") seeking to defraud

NSL out of millions of dollars and to inhibit it from collecting outstanding student loan debt.

Through a network of referral and fee-sharing arrangements, Defendants have conspired to

manufacture federal lawsuits while fraudulently concealing the nature and existence of the

Scheme.

2.      The Defendants operated the Scheme by recruiting and exploiting borrowers in search of so-called "debt-relief counseling"—misleading them into stopping payments on their loans (and thus ruining their credit) and to instead pay the Defendants.  Once a consumer had been recruited, Defendants instructed the consumer to follow a script intended to induce telephone calls from NSL in the hope that those calls would form the basis for a claim under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.  When the Defendants judged that NSL had made a sufficient number of calls, the consumer would be referred to Krohn & Moss, Ltd. or the Law Offices of Ryan Lee, PLLC who would then initiate legal actions either in federal court or through arbitration.  Defendants perpetuated their Scheme by sending fraudulent communications to NSL, including forged letters, and instructing their clients to lie under oath to improve their settlement leverage and to conceal the Scheme.

3.      The Scheme has resulted in substantial losses to NSL, including direct settlement payments to dozens of customers, cancellation of hundreds of thousands of dollars in student loan debt, and attorneys' fees and costs incurred to defend against these lawsuits.

4.      The Scheme also victimized the very consumers whom the Defendants claimed to help.  In following Defendants' instructions to cease payments to NSL and to instead make monthly payments to Defendants, borrowers suffered significant and lasting damage to their public credit.  Borrowers also suffered direct monetary loss when Defendants pocketed the borrowers' monthly payments with no guarantee that the borrowers would receive any pecuniary relief from the Scheme.

5.      It is not just NSL's conclusion that the Scheme was a fraudulent enterprise.  Upon learning the truth of the Defendants' program, their own clients have described their practices as a "scam."  One consumer testified that the Defendants' Scheme was a "scam" and a "set up" and

that she was concerned that she and her ex-husband could "go to jail" for their involvement. Another customer of Defendants Johnson and Biancone described the scam on a public internet forum, and concluded: "So my connections with Doug Johnson a 'consumer debt Advocate' HAS ONLY ADDED TO MY DEBT PROBLEMS. I FEEL THAT THIS WAS A SCAM DESIGNED BY DOUG JOHNSON and EXECUTED BY MICHAEL BIANCONE OF MB CONSULTING UNLIMITED." (capitalization in original). Those conclusions were correct—by operating an association in fact to defraud NSL out of millions of dollars through manufactured claims, fabricated evidence, and forged communications, the Defendants were not operating as legal or counseling professionals; they were operating a scam in violation of federal racketeering law as well as numerous state laws.

## Parties

6.      Plaintiff Navient Solutions, LLC is a Delaware limited liability company in the business of servicing federal and private student loans with its principal place of business in Reston, Virginia. NSL's sole member is Navient Corporation, a Delaware Corporation. NSL was formerly known as "Navient Solutions, Inc." and "Sallie Mae, Inc."

7.      Defendant Krohn & Moss, Ltd. ("K&M") is an Illinois corporation in the business of providing legal services with its principal place of business in Chicago, Illinois.

8.      Defendant Adam Krohn is a natural person domiciled in the state of Illinois and is a principal of K&M. At all times relevant to this Complaint, Defendant Krohn managed the affairs of K&M and participated in and supervised its work on TCPA matters.

9.      Defendant Adam Hill is a natural person domiciled in the state of Illinois and is an employee of K&M. Defendant Hill was lead counsel in almost every TCPA matter in which K&M served as counsel, including, but not limited to, the representations of Kyle & Emily

Bates, Gina and Leslie Timmerman, A.B. and L.B., D.C. and M.C., Morgan Ochsner, and S.I., as described below.

10.     Defendant the Law Offices of Ryan Lee, PLLC ("Law Offices of Ryan Lee") is an Arizona professional limited liability company with its principal place of business in Scottsdale, Arizona.

11.     Defendant Ryan Lee is a natural person domiciled in the state of Arizona and is the principal of the Law Offices of Ryan Lee.  Prior to opening the Law Offices of Ryan Lee, Defendant Lee was an employee of K&M.  Defendant Lee was lead counsel representing C.B. and T.S., as described below.

12.     Defendant National Consumer Advocates, Inc. ("NCAI") is a California corporation with its principal place of business in Northridge, California.

13.     Defendant Doug Johnson is a natural person domiciled in the state of Tennessee.

14.     Defendant Michael Biancone is a natural person domiciled in the state of South Carolina.

15.     Defendant MB Consulting & Investing, Inc. ("MB Consulting") is a South Carolina corporation owned and managed by Defendant Biancone and with its principal place of business in South Carolina.

16.     Defendants John Does #1–20 are additional individuals or entities that have participated in the Scheme whose identities will be determined through discovery from known members of the Scheme.

17.     Defendants Krohn, Hill, Lee, Johnson, and Biancone are referred to herein as the "Individual Defendants."

18.     Defendants Biancone and MB Consulting are referred to herein as the "Biancone Defendants."

19.     Defendants NCAI, Johnson, and the Biancone Defendants are referred to herein as the "Recruiting Defendants."

20.     Defendants K&M and the Law Offices of Ryan Lee are referred to herein as the "Law Firm Defendants."

21.     Defendants Krohn, Hill, and Lee are referred to herein as the "Attorney Defendants."

## Jurisdiction

22.     This Court has subject matter jurisdiction over the claims herein under 28 U.S.C. § 1331 because this case arises under the laws of the United States, namely, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

23.     This Court has subject matter jurisdiction over state-law claims brought herein under 28 U.S.C. § 1367(a) because such claims form part of the same case or controversy as those arising under the laws of the United States, and under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this District, namely, Defendants directed their actions towards NSL knowing that it is based in this district, Defendants advertised their services in the Commonwealth of Virginia, and the events relating to D.C. and M.C., detailed below, took place exclusively in the Eastern District of Virginia.

25.     Venue also is proper in this District under 18 U.S.C. § 1965(a), because Defendants all transact their affairs in the Commonwealth of Virginia by advertising for clients here and by engaging in litigation, including the D.C. and M.C. case below, here.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### NSL and the TCPA

26.     NSL is the largest servicer of student loans in the United States, servicing a portfolio of over $300 billion in outstanding student loans for over twelve million customers, including a mix of loans owned by the federal government, privately owned loans guaranteed by the federal government, and wholly private loans.

27.     Privately owned loans serviced by NSL—whether or not those loans are guaranteed by the federal government—are owned by various trusts or other entities for which NSL is the authorized agent.

28.     Most of NSL's twelve million customers pay down their student loans without incident.

29.     When a borrower falls behind on his or her loan payments, NSL may contact that borrower, as well as others associated with the account.  NSL does this to help borrowers to avoid default by making sure that they are aware of their repayment options.

30.     NSL also does this to protect both public and private funds with which it is charged.  By working with customers to avoid default, NSL protects taxpayer funds that are at risk when a federally owned or guaranteed loan is not repaid.

31.     In fact, the Higher Education Act of 1965 (as amended) and United States Department of Education regulations require NSL to make certain due diligence contacts with customers who fall behind on repaying certain types of loans.

32.     NSL's telephone contact with its customers is subject to regulation by various state and federal laws, including the federal TCPA.

33.     The TCPA was enacted by Congress in 1991 with the purpose of "balanc[ing]" "individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade . . . in a way that protects the privacy of individuals and permits legitimate telemarketing practices."  TCPA Pub. L. No. 102-243 § 2(9), 105 Stat. 2394 (1991).

34.     To achieve this balance without discriminating against certain types of speech, the TCPA restricts the manner in which calls can be made, including placing restrictions on the ability of NSL and other companies to call customers using an automatic telephone dialing system ("ATDS") without their express consent.

35.     In order to deter improper autodialing practices, the TCPA provides for outsized $500 statutory damages for every call that violates the statute.  If violations are willful or knowing, a court may increase the damages to up to $1,500 per violation.

36.     The size of these potential statutory damages has enticed many plaintiffs' attorneys to seek out TCPA cases.  These attorneys frequently bring class action claims against large defendants and use the threat of potentially crippling damages to extract settlements for suits that may be of questionable merit or which depend on unsettled legal issues.  Other attorneys, like those named as Defendants here, are not content to seek these cases out, but have undertaken a scheme to manufacture claims where none existed.

37.     To manufacture these claims, scammers attract student loan borrowers by advertising themselves as "debt counselors" or "debt relief services."  Rather than help these customers to pay or restructure their obligations, many of these scammers—including the Recruiting Defendants—instead advise customers to purposefully stop paying their loans and

attempt to misuse the TCPA and other laws offensively in an effort to avoid their loan obligations.

38.     To comply with the TCPA and other laws, NSL has implemented comprehensive compliance programs pursuant to which, *inter alia*, it will call customers using an ATDS only when it has their express consent to do so.  NSL may obtain such consent as part of the loan application process but also may do so at various points during the course of servicing a customer's loan.

39.     When a customer asks NSL to stop contacting him or her using an ATDS, NSL respects that request and will change to contacting that person using non-automatic dialing methods.

40.     Because these customers still are obligated to pay often-substantial sums on outstanding student loans, NSL may continue to contact customers using permitted methods even if the customer wishes to avoid being contacted.

41.     As part of the Scheme, K&M and the Law Offices of Ryan Lee have targeted NSL's customers to bring TCPA suits on their behalf, seeking windfalls through the threat of costly litigation.

**The Scheme**

42.     Unlike other firms, the Law Firm Defendants have not been content to merely seek out clients with colorable TCPA claims.  Rather, they have collaborated with the Recruiting Defendants and others to recruit clients to manufacture TCPA claims where no claims previously existed.  In many cases, they did this by inducing borrowers who were current on their loans to become delinquent, thereby causing NSL to call them where it had not already been doing so.

43.     The Scheme consists of NCAI, Johnson, and the Biancone Defendants recruiting student loan debtors by advertising "debt counseling" and relief services.  The recruitment of debtors occurs nationwide.

44.     In fact, the Recruiting Defendants do not provide debt relief services at all. Instead, they abuse their knowledge of standard industry practices to advise those clients on how to manufacture lawsuits against NSL.  When the potential statutory damages are equal to or greater than a client's outstanding student loan debt, the Recruiting Defendants refer the client to the Law Firm Defendants to file a lawsuit against NSL.  Typically, to complete the Scheme, the Law Firm Defendants would file a lawsuit or arbitration demand against NSL and either seek a settlement or force NSL to defend itself in a costly arbitration hearing.  To date, the Law Firm Defendants have engaged debtors in multiple different states and pursued claims in multiple states.

45.     To carry out the Scheme, Defendants engaged in a pattern of wire fraud, mail fraud, and witness tampering.  Defendants repeatedly sent false and fraudulent mailings to NSL using the U.S. Postal Service ("USPS").  They repeatedly made fraudulent misrepresentations in legal and arbitration filings that were sent over the wires and made false and fraudulent misrepresentations on various debt relief websites.  And they repeatedly induced or instructed their clients to lie under oath in both court and arbitration proceedings in order to conceal the Scheme and prevent NSL from discovering and raising certain legal defenses.

46.     Throughout this process, only the Law Firm Defendants have engaged in direct dealings with NSL.  Because the manufacture of legal claims relied on subterfuge, the Recruiting Defendants typically concealed their involvement from NSL.  Similarly, because the Law Firm Defendants were party to fee-sharing and referral agreements with non-lawyers that are

10

impermissible under the laws of Illinois, Arizona, and elsewhere that the Attorney Defendants practice, they have actively concealed the existence of the Scheme.

47.     By concealing the existence of the Scheme and providing a false narrative for their clients, Defendants obtained inflated settlements, deprived NSL of the opportunity to raise meritorious defenses to these fabricated legal claims, and committed fraud against NSL.

48.     Defendants also misled their own clients by having them default on their loans as part of a purported debt relief plan, putting their clients in a materially worse position and, in some cases, increasing rather than decreasing their student loan debt as a result of this fraud.

49.     A client is brought into the Scheme by one or more of the Recruiting Defendants—typically by Johnson, Biancone, or Biancone's company, MB Consulting.  Both Biancone and Johnson hold themselves out as debt counselors who can help consumers get out of debt using a variety of techniques.  Biancone is a disbarred attorney.

50.     In fact, Johnson's own advertising demonstrates that his strategy was simply to teach his customers to track "violations" and then bring a lawsuit based upon those purported violations and attempt to extract a settlement.

51.     In a testimonial on a website for U.S. Hardship Group, Johnson described the settlements he achieved as "analogous to winning the lottery."

52.     During this initial stage, Johnson and the Biancone Defendants collaborated with NCAI.  Biancone has acknowledged that MB Consulting had a contractual relationship with NCAI and numerous parties have testified in the context of lawsuits against NSL that Johnson, Biancone, and NCAI all worked together in providing them debt counseling services.

53.     At the direction of Johnson and/or the Biancone Defendants, clients would stop making payments to NSL when they became involved in the Scheme orchestrated by Defendants.

54.     Instead, they would be directed to pay an equivalent amount of money to NCAI on a monthly basis.  Clients were told that this money would be placed in a client trust account that would be used "1) to pay the creditor [here, NSL], 2) to pay for the services of NCAI, and 3) to pay our costs and expenses."

55.     This representation was false.  In fact, NCAI did not use any portion of the funds to pay NSL and NCAI concealed this from its clients.  Instead, NCAI simply kept the full balance of deposited moneys for itself.  In some cases, this caused borrowers who had been current on their loans to become delinquent.

56.     Simultaneously, Johnson and/or the Biancone Defendants would instruct clients to contact NSL and read a script.  The script required the client to confirm the name of the person he or she was speaking to, to confirm the amount owed on his or her student loans, and then to say, "I ask that you please stop calling me and correspond with me in writing from this point forward," and then to provide any or all of his or her telephone numbers.  The client would then say, "Also please do not call me at work because my employer prohibits me from receiving calls," and provide his or her work telephone number.

57.     In many instances, multiple members of the same family would contact NSL, one after another, reading the same script.  In some instances, it is apparent that one person called impersonating his or her relatives.  In others, a voice can be heard in the background on some of the calls providing instructions.

58.     Some clients of the Scheme asked NSL to stop calling them before they ever became delinquent on their loans and at a time when they had not received any calls from NSL. There is no obvious reason why a person would request NSL to stop making calls that had never begun unless one had been instructed to do so as part of the Scheme.

59.     After clients called NSL and read from the script, Johnson or the Biancone Defendants would help them to keep track of any calls received from NSL or businesses to whom the client owed money.  Clients were instructed to send regular emails to Johnson or Biancone listing any calls that they believed they may have received from NSL or any other creditor.  In some cases, Johnson or Biancone would then enter this information into a call log that they maintained.

60.     In other cases, clients would maintain logs of calls received from NSL on a template provided by Johnson or Biancone.

61.     Call logs created with the assistance of Johnson and Biancone used the same font and format consistently, and therefore demonstrate which clients worked with Johnson and Biancone to manufacture their TCPA claims because they all have provided similar looking documents in discovery in multiple TCPA cases.

62.     Because the TCPA provides for $500 in statutory damages for each call, clients were advised that they could expect to receive this much for every time NSL called them. Accordingly, participants in the Scheme referred to calls as equivalent to money.  Clients were advised to track incoming calls until the value of logged calls, based on anticipated statutory damages claims, was large enough to offset the client's outstanding debt, provide fees for the members of the Scheme, and provide the client with an additional windfall.

63.     In order to maximize the size of any legal claims, the Debt Consultant Defendants advised their clients to provide as many phone numbers as possible to NSL in order to receive calls on those numbers.  Clients also were advised to bring family members and friends who had served as cosigners on their loans into the Scheme in order to maximize the number of calls.

64.     Each of these additional parties contacted NSL and read the script described in paragraph 56.

65.     In the event that NSL stopped making telephone calls, clients were advised to contact NSL again to discuss their loans.  This action was aimed at causing NSL to begin calling that customer again to increase the potential damages that could be asserted in any given case.

66.     During this stage of the Scheme, Biancone would affix a given client's name and personal information to a form letter claiming that NSL had changed the client's interest rate and demanding information about the client's loans.  These representations typically were not true and did not have any relationship to that specific client's loan, though, on information and belief, they were intended to spur NSL into calling the client.  Biancone did not show this letter to many of his clients but, typically, would send it to NSL in the client's name without any express approval, fraudulently representing that the client had sent this letter him or herself.

67.     At times, Biancone also would draft letters, in an identical format, based on a client's specific circumstances.  Though sometimes clients were shown these letters, often he would send them himself without any client review or approval, fraudulently misrepresenting that the letter had come from the client to conceal his involvement.

68.     Johnson and the Biancone Defendants provided step-by-step instructions to their clients as to how to take advantage of industry practices to manufacture claims for statutory damages under the TCPA, including providing scripts, templates, and instructions throughout the

process.  During this time, payments were made to the Recruiting Defendants—and, specifically, to NCAI—for the ostensible purpose of resolving the client's student loan debts, though this money was, in fact, pocketed by the Recruiting Defendants.   Once the potential statutory damages for a given client were sufficient to offset the client's debt and provide for an adequate attorney fee, the Recruiting Defendants would refer a plaintiff to one of their attorney partners.

### Role of the Law Firm Defendants

69.     K&M is one of the attorney partners participating in the Scheme.

70.     Upon information and belief, K&M became involved in the Scheme at the direction of Defendant Krohn and through the actions of Defendant Lee.

71.     Prior to approximately February 2016, Defendant Lee was an employee of K&M and participated in their TCPA litigation and the Scheme.

72.     In or around February 2016, Lee left his employment at K&M and founded The Law Offices of Ryan Lee, which is another attorney partner participating in the Scheme.

73.     Once a case is referred to a Law Firm Defendant, the firm would initiate either a federal lawsuit or an arbitration alleging violations of the TCPA premised on calls actively sought out by their clients and recorded by the Recruiting Defendants.

74.     Under express, written agreements between NCAI, K&M, and K&M's clients, when K&M achieved a settlement or judgment in favor of the Scheme's clients, it was to remit a portion of those funds to NCAI for referral fees and other fees that NCAI was purportedly owed by the Scheme's clients.

75.     At least one of these agreements was drafted by Defendant Lee, who, at the time, was an attorney with K&M.

15

76.     These fee-splitting or referral fee agreements violate the professional conduct rules of Illinois and of many other states in which K&M operates.

77.     Upon information and belief, a similar agreement exists between the Recruiting Defendants and the Law Offices of Ryan Lee, contrary to the professional conduct rules of Arizona and other states in which the Law Offices of Ryan Lee operates.

78.     Shortly before discovery was concluded and cases entered the merits stage, the Law Firm Defendants would make a last-minute settlement offer.  To maximize the value of settlements, the Law Firm Defendants actively concealed the involvement of the Recruiting Defendants and the fact that its clients had been coached in how to manufacture a TCPA cause of action.

79.     The Law Firm Defendants also advised their clients to conceal the role of the Recruiting Defendants and to lie about certain facts including, but not limited to, the fact that they were provided a script to read to NSL, the fact that they were taught techniques for tricking NSL into calling them more frequently, and even the very existence of a scheme to abuse the TCPA to help their clients avoid legitimate student loan debts.

80.     It appears that K&M quickly realized that, because the Recruiting Defendants did not deal directly with NSL, K&M could pocket the proceeds of the settlements its clients entered into rather than pay the agreed-upon shares to the Recruiting Defendants.

81.     As early as November 2014, counsel for NSL began receiving letters from the Law Offices of Lewitt, Hackman, Shapiro, Marshall & Harlan, attorneys for NCAI, copying K&M and advising of a balance due on settlement proceeds negotiated by K&M and a purported lien on such proceeds.

82.     In 2015, NCAI began filing notices of liens on settlement proceeds in federal cases in which K&M represented individual plaintiffs against NSL.

83.     In each of these cases, K&M moved to strike the lien, denying that NCAI had played any role in the case or that it had any colorable right to assert an interest over any settlement proceeds.

84.     These representations were false and misleading because, in each case, K&M had entered into a contractual agreement to compensate NCAI out of the settlement proceeds.

85.     In each of these cases, NCAI responded stating that "Krohn & Moss is Counsel in this case because of a *nationwide referral scheme they have established through their agents Biancone and Johnson* and are well aware that their clients first had a contract with NCAI regarding this matter because they *set up the entire scheme to create violations and then have the clients referred to them*." (emphasis added).

86.     Subsequent to these letters and filings, NSL became aware of a lawsuit between NCAI, Biancone, Johnson, and K&M in state court in California, in which NCAI alleged, *inter alia*, that K&M had failed to pay referral fees owed to NCAI.

87.     Biancone, Johnson, and K&M all responded jointly to NCAI's complaint, demonstrating the existence of collaboration among them.

88.     Biancone later appeared *pro se* and, in his filings, admitted several facts demonstrating the existence of the Scheme.

89.     Specifically, Biancone admitted that he was affiliated with NCAI through a written Marketing Services Agreement dated January 23, 2012 through which he assisted NCAI with its "debt relief service."

90.     On June 24, 2016, the United States District Court for the Western District of Pennsylvania issued a decision in *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782 (W.D. Pa. 2016).   Relying on recent Supreme Court precedent, the court held that a professional plaintiff who had deliberately sought out calls from others with the aim of manufacturing lucrative TCPA claims against unsuspecting defendants had not been harmed by those calls and, accordingly, lacked an injury-in-fact sufficient to confer standing in federal court.

91.     This ruling created a new challenge to the Scheme: if evidence were introduced to show that a plaintiff had, with the help of the Debt Consultant Defendants, set out deliberately to create a TCPA suit with the intention of obtaining a windfall and avoiding his legitimate debts, it was now possible that a court or arbitrator would dismiss a case in its entirety.

92.     Accordingly, K&M instructed its clients to lie under oath about whether they had worked with the Debt Consultant Defendants and to continue to actively conceal the existence and scope of the Scheme to allow them to continue maintaining manufactured TCPA suits.

93.     In the fall of 2016, Emily Jo Bates, a plaintiff in a TCPA suit against NSL represented by K&M, backed out of the Scheme, changed her attorney, and entered into a nominal settlement with NSL.   Thereafter, Ms. Bates submitted to a deposition in which she described the full scope and nature of the Scheme.

94.     Following the exposure of the scheme by Ms. Bates, NSL uncovered evidence of the Scheme's operation in many cases brought by the Attorney Defendants.   Each of these cases had shared elements, including plaintiffs who had read from an identical script, call logs that matched the format used by Biancone and Johnson, and letters that appeared to have been written and sent by Biancone rather than from the individuals who purportedly sent the letters.

95.     Throughout this time, K&M continued to deny the existence of the Scheme, including during proceedings, in federal court filings, and in briefs and other filings sent through the mails and over the wires.

96.     Nevertheless, multiple federal district courts issued orders extending discovery for the express purpose of allowing NSL to conduct discovery into the Scheme for the purpose of rebutting plaintiffs' standing.

97.     Apparently aware that the Scheme had been uncovered, in early 2017, K&M began voluntarily dismissing cases in which the Scheme was evident, apparently hoping to avoid further discovery into the Scheme and the exposure of K&M's wrongful actions in furtherance of the Scheme.

98.     Between January 2014 and February 2017, NSL suffered millions of dollars in losses to its business by reason of the Defendants' racketeering activity.  NSL paid not less than $1,147,603.86 in settlements to plaintiffs represented by K&M and who are believed to have been involved in the Scheme.

99.     Each of these payments was obtained by a pattern of fraud and deception, including various acts of wire fraud, mail fraud, witness tampering, and other wrongful and tortious activity, as detailed below.

100.    NSL would not have paid out these settlements but for K&M's efforts to conceal the Scheme.

101.    Further, the Scheme's efforts have required NSL to cancel over $ 1.1 million in valid student debt as a condition of settlements extracted by fraud and the concealment of the Scheme.  This does not include the value of debts that remain outstanding but that, because of

Defendants' interference in NSL's contractual relationships with its customers, are unlikely ever to be repaid.

102.    Defending against the TCPA suits that were manufactured by the Scheme was costly, and required NSL to incur over $500,000 in attorneys' fees, not including time and resources devoted by NSL's in-house attorneys and other employees who had to devote their efforts to defending against manufactured lawsuits.

103.    Upon information and belief, Defendants continue to recruit debtors and to pursue their manufactured claims, with only slight changes in their tactics, as they have since 2014. Absent relief, Defendants will continue to engage in this pattern of racketeering activity.

<u>**Cases Exemplifying the Scheme:**</u>

<u>**Kyle and Emily Bates**</u>

104.    Kyle Bates and Emily Bates (formerly Emily Gilbert) were married in Indiana on May 21, 2000.

105.    In or around 2001, Kyle Bates and Emily Bates consolidated their individual outstanding federal Stafford student loans into a single spousal consolidation loan (the "Bates Loan") serviced by NSL (known at the time as Sallie Mae, Inc.).

106.    On August 8, 2011, the Superior Court for the County of Hamilton, Indiana issued a Decree of Dissolution of Marriage and Settlement Agreement dissolving the marriage of Kyle Bates and Emily Bates.  Pursuant to the terms of the divorce and settlement agreement, Kyle Bates was to be solely responsible for the outstanding $40,320.00 balance on the Bates Loan.

107.    Despite this legal obligation, Kyle Bates did not make the required payments on the Bates Loan.

108.    In or around 2014, Kyle Bates heard an advertisement on the radio advertising assistance with debt relief.

109.    Kyle Bates called that number and was referred to Michael Biancone, who, in turn, referred Kyle Bates to Doug Johnson.  It was Kyle Bates's belief that Biancone and Johnson were working together.

110.    The Debt Consultant Defendants explained the Scheme to Kyle Bates and he understood that he would be taking advantage of the TCPA to manufacture a legal claim against NSL that he would then use to attempt to eliminate the Bates Loan.

111.    In or around June 2014, Kyle Bates signed an agreement with NCAI that was negotiated through Biancone and an entity referred to as "MB Consulting Unlimited."  Upon information and belief, MB Consulting Unlimited was actually a mistaken reference to MB Consulting.

112.    According to Kyle Bates, Johnson was also working with NCAI.

113.    Pursuant to his agreement with NCAI, Kyle Bates agreed to pay $379.89 per month to NCAI.

114.    This amount was almost identical to the amount that Kyle Bates was obligated to pay to NSL at that time, which was approximately $381 per month.

115.    In or around June 2014, Kyle Bates ceased attempting to make payments to NSL altogether and, instead, sent money to NCAI.  Biancone had falsely represented to Kyle Bates that the money paid to NCAI would be used to help resolve his debt to NSL.

116.    On or about July 1, 2014, Kyle Bates called NSL and recited a script that he had been given by Johnson.  The script used by Kyle Bates was substantially identical to that described above in paragraph 56.

117.     Kyle Bates did this at the express instruction of Johnson, who provided him with the script.

118.     Around this time, Kyle Bates approached Emily Bates and asked her to speak with him and Johnson on a conference call.

119.     Shortly thereafter, Emily Bates had a telephone conversation with Johnson where he explained the Scheme to Emily Bates.  Emily Bates told him that it sounded like a "scam" to her.

120.     However, because Kyle Bates had made it clear that he was not going to pay the Bates Loan, Emily Bates participated in the Scheme because she did not believe there was any other way to protect her credit.

121.     After that conversation, Kyle Bates spoke with Emily Bates on the phone and told her to call NSL and gave her a "spiel of what to say," including "what to include when I said it, to find out who I was speaking to, to find out how much the balance of the loan was."

122.     Kyle Bates told Emily Bates that this information had come from Johnson.

123.     Around the same time, Emily Bates also received an email from Doug Johnson that included a script substantially identical to that described above in paragraph 56.

124.     On July 1, 2014, Emily Bates called NSL and read the script she had been provided.  After doing so, she sent an email to Johnson to confirm the date and time, the name of the agent she spoke with, and the outstanding loan balance.

125.     In January 2015, Emily Bates reported to Kyle Bates that she had not received any calls from NSL since November 2014.

126.     In response, Kyle Bates advised Emily Bates to contact Johnson because "he might have [her] fix that one way or another" so that she would receive more calls again.

127.     Kyle Bates went on to suggest ways that Emily Bates might be able to cause NSL to call her again, including that she could "have or use [her] moms home number which would be more money than cell and just have it go to answer machine[;] theyll call it to[o] but you have to call them and do the donot call thing and give them that number and they will blow it up."

128.     Kyle Bates also suggested that Emily Bates should provide additional contact numbers to NSL to generate additional telephone calls, and therefore, additional possible legal claims.

129.     As Emily Bates explained, this was because "[w]e wanted [NSL] to call so that the numbers and times of each phone call would add up."

130.     Also in January 2015, Emily Bates received a letter from NCAI (erroneously dated January 5, 2014) stating that she had failed to make a payment according to her agreement with NCAI entered into through Biancone and "MB Consulting Unlimited."

131.     Emily Bates was surprised by this because she had never entered into any such agreement and had never heard of NCAI or Biancone.

132.     Emily Bates sent an email to Biancone asking about the letter she had received. In response, she received a call from Johnson, who told her that there had been a discrepancy between Johnson and Biancone and that Emily Bates was not required to pay anything.

133.     In late-January 2015, Emily Bates expressed an interest in abandoning the Scheme, telling Kyle Bates "it is a scam[,] they are liars just like you."  "You should not have borrowed money for an education if you had no intention of paying it back.  Now you want the easy way out and its gonna blow up in your face from all sides.  No more from me."

134.   Kyle Bates responded asking her to remain involved in the Scheme and telling her that "Doug [Johnson] sent me your logs and mine[,] we[']re tall[y]in it up and see[i]n[g] if [there's] enough to push it thr[ough]."

135.   On or about February 12, 2015 a letter was sent to NSL via the USPS ostensibly signed by Kyle Bates and requesting a "full billing statement" to be sent to him.

136.   In fact, this was not the case; Kyle Bates had never seen this letter, did not sign it, and did not send it.

137.   Instead, the letter was sent by Biancone who was fraudulently impersonating Kyle Bates.

138.   On or about March 12, 2015, another letter was sent to NSL via the USPS purportedly from Kyle Bates and stating that he had not received the requested billing statements and claiming that the interest rate and/or fees on the Bates Loan had been improperly increased without notice.   The letter requested a wealth of information for the purported purpose of "audit[ing Kyle Bates's] most recent statement and obtain[ing] clarification."

139.   The letter also claimed that if a satisfactory response was not received, Kyle Bates would unilaterally send a check intended to resolve any outstanding debt.

140.   The substance of this letter was materially false and incorrect: NSL had not improperly changed or increased the interest or fees on the Bates Loan and, to the extent any fees or interest changes were incurred, these were made consistent with the terms of the Bates Loan and with such notice as was required.

141.   This letter also falsely represented that it was sent from Kyle Bates.   In fact, it was sent by Biancone fraudulently impersonating Kyle Bates.

142.   This is further evidenced by the postmark on the letter.  Though Kyle Bates lives in Indiana, the letter bears a Columbia, South Carolina postmark.  Biancone is a resident of South Carolina.

143.   On or about July 25, 2015, a letter was sent to NSL via the USPS purportedly from Emily Bates.

144.   In fact, Emily Bates had no awareness of the existence of this letter and had never seen it.

145.   Upon information and belief, this letter was sent by Biancone, fraudulently impersonating Emily Bates.

146.   Throughout this period, Kyle and Emily Bates were both memorializing when they received calls from NSL and sending that information to Johnson.

147.   Johnson collected the information about calls received by NSL into a call log.

148.   In early 2015, Kyle and Emily Bates had, with the help of the Recruiting Defendants, recorded enough calls to fully offset the Bates Loan and provide for a profit for the Defendants if they were paid $500 for each call.

149.   At that time, Biancone and Johnson referred Kyle and Emily Bates to K&M, who engaged them as clients.

150.   K&M filed a lawsuit on behalf of Kyle and Emily Bates in the United States District Court for the Southern District of Indiana on April 13, 2015.

151.   In the course of that case, Kyle Bates was deposed pursuant to Federal Rule of Civil Procedure 30 on September 2, 2016.

152.   While under oath, Kyle Bates made several materially false statements.

153.    While under oath, Kyle Bates falsely stated that he was never instructed by anybody to call NSL and ask that NSL stop calling him.  That statement was false because Johnson had told him to do so.

154.    While under oath, Kyle Bates falsely stated that he had never received a script to read when calling NSL.  That statement was false because Johnson and/or Biancone had provided him with a script and, on several occasions before filing suit, Kyle Bates referred to the need to recite what Johnson had provided.

155.    For example, on July 27, 2016, Kyle Bates sent a text message to Emily Bates in which he said that he would verify with her "how you were supposed to recite" a script requesting NSL to stop calling her.

156.    Kyle Bates falsely stated that he did not want to receive calls from NSL. That statement was false because Kyle Bates had engaged in concerted efforts to receive additional calls from NSL after the calls stopped in order to sue NSL for more money.

157.    Upon information and belief, Kyle Bates was instructed to make these false statements by K&M and its co-Defendants in violation of 18 U.S.C. § 1512(b) because they believed that it was necessary to conceal the existence of the Scheme in order to force a settlement out of NSL and to avoid detection of the Scheme and Defendants' violations of law and professional ethics.

158.    On or about October 4, 2016, Emily Bates settled her claims against NSL and dismissed those claims with prejudice.

159.    Following the settlement, Emily Bates agreed to submit to a deposition on November 30, 2016.

160.     At that deposition, Emily Bates no longer was represented by K&M and, instead, had retained new counsel of her own.

161.     At that deposition, Emily Bates testified truthfully and contradicted several elements of Kyle Bates's story.

162.     At her deposition, Emily Bates testified that Johnson had instructed her to call NSL and emailed her a script to use and that Kyle Bates had also provided her with a script from Johnson telling her what to say.

163.     At her deposition, Emily Bates testified that the goal of the Scheme was to receive a certain number of calls.

164.     She explained that Kyle Bates had told her to try to maximize the number of calls that she had received and that he had told her to contact Johnson for help doing so.

165.     Emily Bates also authenticated and explained several documents demonstrating the existence of the Scheme and its methods, including communications between her and Defendants and communications between her and Kyle Bates discussing the Scheme.

166.     Emily Bates testified that she had thought Defendants were engaging in a "scam" and a "set up" and she was concerned that they could "go to jail" for their involvement.

167.     On or about December 6, 2016—less than a week after Emily Bates's deposition uncovered the details of the Scheme—Kyle Bates dismissed his claims with prejudice.

### Gina and Leslie Timmerman

168.     Gina Timmerman and Leslie Timmerman are a wife and husband living in Georgia and the borrowers of several student loans serviced by NSL.

169.     On or about June 25, 2014 at 1:10 p.m., Gina Timmerman called NSL and had a conversation with a call-center agent.

170.    During this conversation, she provided NSL with a telephone number that had not previously been associated with her file.

171.    Also during this conversation, Gina Timmerman confirmed the identity of the agent and confirmed her loan balance and then said, "stop calling me and correspond with me directly in writing from this point forward," and provided the same telephone number that she had just provided for the first time.  She then said "please do not call my employer since my employer prohibits me from receiving calls."

172.    This language closely matched the script provided by Johnson and Biancone and described in paragraph 56.

173.    There is no obvious reason why Gina Timmerman would have requested that NSL stop making calls to a number that NSL did not even have in her file.

174.    Upon information and belief, the reason that Gina Timmerman asked for NSL to stop calling her is that she had been instructed to do so by Johnson and/or Biancone in order to manufacture a TCPA claim against NSL.

175.    On or about June 25, 2014 at 1:14 p.m., a woman called NSL and fraudulently identified herself as Leslie Timmerman.

176.    Upon information and belief, this call was actually placed by Gina Timmerman because the caller had an identical voice to the call from Gina Timmerman just a few minutes earlier and the caller seemed to be a woman whereas Leslie Timmerman is a man.

177.    During this conversation, the caller confirmed the identity of the agent and confirmed Mr. Timmerman's loan balance and then said, "I'm going to ask that you please stop calling me and that you correspond with me in writing from this point forward," and provided a

phone number.  She then said "do not call my work; my employer prohibits me from receiving calls."

178.    This language closely matched the script provided by Johnson and Biancone and described in paragraph 56.

179.    On or about June 29, 2014 at 5:57 p.m., a different caller called NSL and identified himself as Leslie Timmerman.

180.    This caller seemed to be male but, in any event, had a distinctly different voice from the person who had identified herself as Leslie Timmerman on June 25, 2014.

181.    During this conversation, the caller said, "please stop calling me and correspond with me in writing from this point," and provided his phone number.  He then said "do not call my work as my employer prohibits us from receiving calls."

182.    This language closely matched the script provided by Johnson and Biancone and described in paragraph 56.

183.    On or about July 28, 2014, two substantially identical letters in different fonts were sent to NSL via the USPS purportedly from Gina Timmerman and Leslie Timmerman and claiming that the interest rate and/or fees on their student loans had been improperly increased without notice.   The letter requested a wealth of information for the purported purpose of "audit[ing their] most recent statement and obtain[ing] clarification."

184.    Curiously, both letters included the line, "Had I been aware that you were going to increase my interest rate, I would have considered cancelling the card," even though NSL does not issue credit cards and the student loans owed by Gina Timmerman and Leslie Timmerman cannot be unilaterally "canceled" by a borrower.

185.     The letter also claimed that if a satisfactory response was not received, the sender would unilaterally send a check intended to resolve any outstanding debt.

186.     With the exception of the account number, the address and name of the alleged signatory of the letter, and portions of the introductory paragraph, these letters were substantially identical in contents and format to the letter that NSL received from Kyle Bates including on March 12, 2015 and described above in paragraphs 138–139.

187.     The substance of these letters was materially false and incorrect: NSL had not improperly changed or increased the interest or fees on either Gina Timmerman's or Leslie Timmerman's student loans and, to the extent any fees or interest changes were incurred, these were made consistent with the terms of their loans and with such notice as was required.

188.     NSL also had not issued any "card" to Gina Timmerman or Leslie Timmerman.

189.     Upon information and belief, these letters also falsely represented that they were sent from Gina Timmerman and Leslie Timmerman.  In fact, both letters were sent by Biancone fraudulently impersonating the Timmermans.

190.     On December 5, 2014, K&M, through local counsel, filed a lawsuit on behalf of Gina Timmerman and Leslie Timmerman against NSL in the United States District Court for the Southern District of Georgia alleging claims arising under the TCPA.

191.     On January 23, 2015, the court stayed all proceedings in that case for the parties to arbitrate their dispute by the consent of the parties.

192.     K&M subsequently filed a demand for arbitration against NSL on behalf of Gina and Leslie Timmerman.

## **A.B. and L.B.**[1]

193.    A.B. was a borrower of several student loans serviced by NSL.

194.    A.B.'s mother, L.B., cosigned several of these loans.

195.    As of early 2014, A.B. had received a degree, obtained a job in his chosen field, and had been making regular payments on his student loans.

196.    Nevertheless, in the summer of 2014, A.B. contacted Johnson and/or Biancone for assistance in avoiding his student loan obligations.

197.    At Johnson and Biancone's instruction, A.B. ceased making payments on his loans in or around August 2014.

198.    Upon information and belief, A.B. began making payments to NCAI sometime after August 2014.

199.    Upon information and belief, the payments A.B. made to NCAI were roughly equivalent to his monthly loan payments.

200.    On or about September 5, 2014, A.B. had a conversation with a call-center agent for NSL.

201.    During this conversation, A.B. requested information about his loan balance and then said, "please stop calling me and correspond with me in writing from this point forward," and provided his phone numbers.

202.    At this time, A.B. was not delinquent on his student loans.

203.    Accordingly, as of September 5, 2014, A.B. was not actually receiving calls from NSL when he asked NSL to stop calling him.

---

[1] The names of certain consumers are redacted and concealed because many aspects of their cases are protected pursuant to confidentiality orders entered in their respective arbitration proceedings.

204.   There is no obvious reason why A.B. would have requested that NSL stop making calls that it was not, in fact, making at that time.

205.   Upon information and belief, the reason that A.B. asked for NSL to stop calling him is that he had been instructed to do so by Johnson and/or Biancone in order to manufacture a TCPA claim against NSL.

206.   A.B. had two subsequent conversations with NSL call-center agents on October 3, 2014 and again on December 11, 2014.

207.   During those calls, he also requested information about his loan balance and then said, "please stop calling me and correspond with me in writing from this point forward," and provided his phone numbers.

208.   This was the same exact language that he used during his September 5, 2014 call with NSL.

209.   This language also matched the script provided by Johnson and Biancone and described in paragraph 56.

210.   In October 2014, a letter was sent to NSL via the USPS purportedly from A.B. and L.B. demanding that NSL cease and desist calling them.

211.   On or about January 29, 2015, a letter was sent to NSL via the USPS purportedly from A.B. and claiming that the interest rate and/or fees on his student loans had been improperly increased without notice.  The letter requested a wealth of information for the purported purpose of "audit[ing A.B.'s] most recent statement and obtain[ing] clarification."

212.   The letter also claimed that if a satisfactory response was not received, A.B. would unilaterally send a check intended to resolve any outstanding debt.

213.    With the exception of the account number, the address and name of the alleged signatory of the letter, and portions of the introductory paragraph, this letter was identical in content and format to the letter that NSL received from Kyle Bates on March 12, 2015 and described above in paragraphs 138–139.

214.    The substance of this letter was materially false and incorrect: NSL had not improperly changed or increased the interest or fees on A.B.'s student loans and, to the extent any fees or interest changes were incurred, these were made consistent with the terms of his loans and with such notice as was required.

215.    This letter also falsely represented that it was sent from A.B.  In fact, it was sent by Biancone fraudulently impersonating A.B.

216.    The Recruiting Defendants advised A.B. to maintain a call log to track calls he received from NSL after September 2014.

217.    Between September 2014 and 2015, A.B. maintained a call log with the assistance of the Recruiting Defendants.

218.    Over that time, A.B. also assisted L.B. to maintain a call log.

219.    Call logs for A.B. and L.B. were compiled in a chart provided by the Recruiting Defendants.

220.    This is clear from the fact that A.B. and L.B.'s call logs are formatted identically to the call logs provided by Kyle Bates and created by Johnson.

221.    In or around the fall of 2015, A.B. and L.B. were referred to K&M by the Recruiting Defendants.

222.    In December 2015, K&M, through local counsel, filed a lawsuit on behalf of A.B. and L.B. against NSL in federal court alleging claims arising under the TCPA.

33

223.    In early 2016, the court stayed and administratively closed that case and ordered the parties to arbitrate their dispute by the consent of the parties.

224.    In the process of that arbitration, the parties filed and exchanged numerous briefs, all of which were filed by electronic mail.

225.    An in-person arbitration hearing was held on November 18, 2016 in Baltimore, Maryland.

226.    This hearing related to the exact same claims that A.B. and L.B. had filed in federal court in December 2015.

227.    At that hearing, A.B. testified under oath that nobody had advised him in preparing his TCPA claim against NSL.

228.    On cross examination, A.B. admitted that this representation was false and, in fact, that he had worked with Johnson and Biancone and that they had advised him in his dealings with NSL.

229.    At that hearing, A.B. also testified under oath that he was not given a script to use when he contacted NSL in September, October, and December 2014.

230.    This was false because A.B. had, in fact, received a script to read to NSL, which was apparent from the fact that his language was the same each time and matched other clients of the Scheme.

231.    At that hearing, A.B. testified that nobody had told him to keep a call log or advised him in doing so, but admitted only that Johnson and/or Biancone had said it would be a good idea.

232.    In fact, this was false because A.B. kept a call log on a template provided by Johnson for that express purpose.

233.   When A.B. was questioned about the role of the Recruiting Defendants, Defendant Hill attempted repeatedly to interpose objections in order to prevent the exposure of the Scheme.

234.   Upon information and belief, A.B. testified falsely about the involvement of the Recruiting Defendants in his case because he was advised to do so by Defendants in order to conceal the Scheme.

235.   Upon information and belief, this concealment was attempted, in part, because Defendants feared that the existence of the Scheme could jeopardize their case.

236.   Following the hearing, K&M submitted post-hearing briefs on A.B.'s behalf. These briefs were filed by electronic mail.

237.   In one such brief, signed by Defendant Hill, K&M insisted that A.B. did not want NSL to call him and that he had done nothing to manufacture a TCPA claim.

238.   K&M also expressly denied that A.B.'s actions bore any resemblance or relation to the scam described by Emily Bates in her deposition, as discussed above in paragraphs 162–166.

239.   K&M repeatedly denied that any "scheme" existed among Defendants.

240.   K&M also denied that there was any factual basis to NCAI's allegations (discussed below) that it was owed money by K&M for its work performed for certain NCAI clients.

241.   In fact, this was not true.  K&M was well aware that A.B. had participated in the Scheme with Johnson and Biancone, that he had contrived to receive calls for the purpose of manufacturing a TCPA claim, and that his case bore a close factual resemblance to the scheme accurately described by Emily Bates in her deposition.  K&M also was aware that many of its

clients had executed agreements drafted by a K&M attorney and obligating K&M to make payments to NCAI.

242.    These fraudulent statements were made by K&M for the purpose of misleading the arbitrator into thinking that the Scheme did not exist because K&M feared that disclosure of the Scheme would compromise its ability to prevail on behalf of A.B. and L.B.

243.    These fraudulent statements also were made to conceal K&M's participation in improper fee-sharing arrangements with non-lawyers.

### D.C. and M.C.

244.    D.C. was a borrower of several student loans serviced by NSL.

245.    D.C.'s mother, M.C., cosigned on several of these loans.

246.    D.C.'s grandmother, R.A., also cosigned on several of his loans.

247.    Sometime in late 2014 or early 2015, D.C. contacted Johnson and/or Biancone for assistance in avoiding his student loan obligations.

248.    The Recruiting Defendants then advised D.C. and M.C. on how to manufacture a TCPA claim against NSL to avoid their student loan debts.

249.    On or about January 15, 2015, D.C. had a conversation with a call-center agent for NSL.

250.    Upon information and belief, he read a script asking NSL to "stop calling me and correspond with me in writing from this point forward."

251.    On or about January 17, 2015, a letter was sent to NSL via the USPS purportedly from D.C.

252.    This letter stated that D.C. had "come into a financial situation which is making me question all of my debts that are outstanding" and he needed to "look at how I am paying these debts."  Accordingly, the letter requested a "full billing statement."

253.    The letter used the exact same font and formatting as letters that NSL had received from other known participants in the Scheme.

254.    The letter falsely represented that it was sent by D.C.  In fact, it was sent by Biancone falsely impersonating D.C.

255.    On or about February 11, 2015, M.C. had a conversation with a call-center agent for NSL.

256.    During this conversation, M.C. verified the agent's name and employee number and then asked NSL to "stop calling me and correspond with me in writing from this point forward," and provided her phone numbers.  When asked to repeat herself, she repeated "correspond with me in writing from this point forward."

257.    M.C. had two subsequent conversations with NSL call-center agents, one merely a day later on February 12, 2015, and one on February 27, 2015.

258.    During each of these conversations, she again asked NSL to "stop calling me and correspond with me in writing from this point forward," and then provided her phone numbers.

259.    During two of her three conversations with NSL agents, M.C. was asked to repeat herself at least once and did so, using the exact same wording each time.

260.    On or about January 16, 2015, R.A. made three calls to NSL within a few minutes of one another.

261.    On the first two calls, it is not clear that she was ever connected to a call-center agent.

37

262.    Instead, a conversation can be overheard on both calls between her and a young male.

263.    During the third such call, R.A. conversed with an agent.

264.    During that call, she asked for "the calling to stop, correspond with me in writing from this call forward," and then proceeded to give her phone numbers before asking for the name of NSL's agent.

265.    On or about July 6, 2015, a letter was sent to NSL via the USPS purportedly from M.C. and claiming that the interest rate and/or fees on the student loans had been improperly increased without notice.  The letter requested a wealth of information for the purported purpose of "audit[ing M.C.'s] most recent statement and obtain[ing] clarification."

266.    The letter also claimed that if a satisfactory response was not received, M.C. would unilaterally send a check intended to resolve any outstanding debt.

267.    With the exception of the account number, the address and name of the alleged signatory of the letter, and portions of the introductory paragraph, this letter was identical in content and form to the letter that NSL received from Kyle Bates on March 12, 2015 and described above in paragraphs 138–139.

268.    The substance of this letter was materially false and incorrect: NSL had not improperly changed or increased the interest or fees on any student loans on which M.C. was obligated and, to the extent any fees or interest changes were incurred, these were made consistent with the terms of those loans and with such notice as was required.

269.    This letter also falsely represented that it was sent by M.C.  In fact, it was sent by Biancone fraudulently impersonating M.C.

270.    After January 2015, D.C. and M.C. kept call logs recording calls purportedly received from NSL.

271.    These call logs were kept on the advice of Johnson and/or Biancone.

272.    The call logs were maintained in the format provided to D.C. and M.C. by the Recruiting Defendants.

273.    In January 2016, K&M, through local counsel, filed a lawsuit on behalf of D.C. and M.C. against NSL in federal court alleging claims arising under the TCPA.

274.    In March 2016, the court dismissed that case after the parties agreed to arbitrate the dispute.

275.    In the process of that arbitration, the parties filed and exchanged numerous briefs, all of which were filed by electronic mail.

276.    In one such brief that K&M submitted on D.C. and M.C.'s behalf, K&M insisted that D.C. and M.C. did not want NSL to call them and that they had done nothing to manufacture a TCPA claim.

277.    K&M also expressly denied that D.C.'s actions bore any resemblance or relation to the scam described by Emily Bates in her deposition, as discussed above in paragraphs 162–166.

278.    K&M expressly denied that it had done any work for NCAI clients or that there was any factual basis to NCAI's allegations (discussed below) that it was owed money by K&M for its work performed for certain NCAI clients.

279.    In fact, this was not true.   K&M was well aware that D.C. and M.C. had participated in the Scheme with Johnson and Biancone, that they had contrived to receive calls for the purpose of manufacturing a TCPA claim, and that their case bore a close factual

resemblance to the scheme accurately described by Emily Bates in her deposition.  K&M was also aware that many of its clients had executed agreements drafted by a K&M attorney and obligating K&M to make payments to NCAI.

280.   These fraudulent statements were made by K&M for the purpose of misleading the arbitrator into thinking that the Scheme did not exist because K&M feared that disclosure of the Scheme would compromise its ability to prevail on behalf of D.C. and M.C.

281.   These fraudulent statements were also made to conceal K&M's participation in improper fee-sharing agreements with non-lawyers.

282.   Shortly before the arbitration hearing, the case was voluntarily dismissed by D.C. and M.C.

283.   Upon information and belief, the case was dismissed because K&M was aware that going forward would shed additional unwanted light on the Scheme and on K&M's improper activities.

**Morgan Ochsner**

284.   Morgan Ochsner (formerly Morgan Landry) was a borrower of several student loans serviced by NSL.

285.   In or around the spring of 2014, Ochsner was trying to get somebody "to help [her] with her debt."

286.   In furtherance of that aim, she contacted Johnson and/or Biancone for assistance in avoiding her student loan obligations.

287.   The Recruiting Defendants recruited Ochsner to the Scheme.

288.   Ochsner made monthly payments to NCAI according to an agreement with the Recruiting Defendants.

289.    Upon information and belief, the payments Ochsner made to NCAI were roughly equivalent to her monthly loan payments.

290.    Ochsner made payments to NCAI instead of NSL because she had been falsely told that the money paid to NCAI would be used to resolve her debt to NSL.

291.    In or around May 2014, Ochsner stopped making payments to NSL on her student loans.

292.    She did this on the instructions of one or more of the Recruiting Defendants.

293.    On or about May 21, 2014, Ochsner had a conversation with a call-center agent for NSL.

294.    During this conversation, Ochsner asked NSL to "please stop calling me and correspond in writing with me from this point forward."

295.    At this time, Ochsner was not yet delinquent on her student loans.

296.    Accordingly, as of May 21, 2014, Ochsner was not actually receiving calls from NSL when she asked NSL to stop calling her.

297.    Upon information and belief, the real reason that Ochsner asked for NSL to stop calling her is that she had been instructed to do so by the Recruiting Defendants pursuant to the Scheme.

298.    On or about June 5, 2015, a letter was sent to NSL via the USPS purportedly from Ochsner and claiming that the interest rate and/or fees on her student loans had been improperly increased without notice.  The letter requested a wealth of information for the purported purpose of "audit[ing Ochsner's] most recent statement and obtain[ing] clarification."

299.    Curiously, both letters included the line, "Had I been aware that you were going to increase my interest rate, I would have considered cancelling the card," even though NSL does

not issue credit cards and the student loans owed by Ochsner cannot be unilaterally "canceled" by a borrower.

300.   The letter also claimed that if a satisfactory response was not received, Ochsner would unilaterally send a check intended to resolve any outstanding debt.

301.   This letter was substantively identical in content to the letter that NSL received from Kyle Bates on March 12, 2015 and described above in paragraphs 138–139.

302.   The substance of this letter was materially false and incorrect: NSL had not improperly changed or increased the interest or fees on Ochsner's student loans and, to the extent any fees or interest changes were incurred, these were made consistent with the terms of her loans and with such notice as was required.

303.   This letter also falsely represented that it was sent from Ochsner.  In fact, it was sent by Biancone fraudulently impersonating Ochsner.

304.   On or about August 12, 2015, K&M, through local counsel, filed a lawsuit on behalf of Ochsner against NSL in the United States District Court for the Western District of Louisiana alleging claims arising under the TCPA.

305.   In the course of that case, Ochsner was deposed pursuant to Federal Rule of Civil Procedure 30 on July 25, 2016.

306.   At that deposition, Ochsner testified under oath that individuals who were advising her respecting her debts sent a letter to NSL on her behalf.

307.   The individuals to which Ochsner referred were the Recruiting Defendants.

308.   However, Ochsner testified falsely that she had written the letter herself.

309.   In fact, the letter was substantively identical in nearly every respect to other letters written by the Recruiting Defendants and discussed above.

310.    Upon information and belief, Ochsner falsely represented that she had written the letter, at the behest of K&M in order to conceal the existence and scope of the Scheme.

311.    On October 3, 2016, the court granted a motion by NSL to, *inter alia*, allow for further discovery into whether Ochsner's efforts to manufacture a TCPA claim deprived her of standing.

312.    On February 3, 2017, NSL attempted to serve deposition subpoenas on Defendants NCAI, MB Consulting, Johnson, and Biancone but were unable to secure their appearance for depositions.

313.    Just four days later, on February 7, 2017, Ochsner, through K&M, filed a Motion for Voluntary Dismissal with Prejudice, seeking the dismissal of her claim against NSL by court order.

314.    On February 8, 2017, that motion was granted and Ochsner's claim against NSL was dismissed.

315.    Following that dismissal, K&M filed a motion to quash those subpoenas.  The subpoenas eventually were withdrawn by NSL and NSL's counterclaims dismissed.

316.    Upon information and belief, K&M sought to dismiss this case because it was aware that going forward would shed additional light on the Scheme and on K&M's improper activities.

## C.B. and T.S.

317.    C.B. was a borrower of several student loans serviced by NSL.

318.    C.B.'s mother, T.S., cosigned some of those loans.

319.    C.B. was recruited by Biancone and Johnson into the Scheme through an organization called The National Student Loan Program.

320.     Biancone instructed C.B. to stop paying money to NSL for his student loans.

321.     C.B. did not make any payments to NSL after September 2015.

322.     Instead, C.B. was instructed to pay money into a trust managed by Biancone.

323.     C.B. was informed that this money would be used to settle his student loan debt.

324.     In fact, this was not true.  Rather, the money C.B. paid into the trust was kept by the Recruiting Defendants and was never to be used to pay NSL.

325.     At no point did Biancone contact NSL to compromise C.B.'s debt.

326.     On or about October 11, 2015, C.B. had a conversation with a call-center agent for NSL.

327.     During that conversation, C.B. confirmed the name of the agent and then said, "please stop calling me and correspond with me in writing from this time and point forward," and provided his telephone number.  C.B. then said, "please don't call me at work because my employer prohibits me from receiving calls."

328.     Also, on or about October 11, 2015, T.S. had a conversation with a call-center agent for NSL.

329.     During that conversation, T.S. confirmed the name of the agent and then said, "please stop calling me and correspond with me in writing from this point forward," and provided her cellular number.  T.S. then said, "And then please don't call me at work because my employer prohibits me from receiving such calls."

330.     On or about September 3, 2015, a letter was sent to NSL purportedly from C.B. and claiming that the interest rate and/or fees on his student loans had been improperly increased without notice.  The letter requested a wealth of information for the purported purpose of "audit[ing C.B.'s] most recent statement and obtain[ing] clarification."

44

331.   The letter claimed that if a satisfactory response was not received, C.B. would unilaterally send a check intended to resolve any outstanding debt.

332.   This letter was substantively identical in content to the letter that NSL received from Kyle Bates on March 12, 2015 and described above in paragraphs 138–139.

333.   The substance of this letter was materially false and incorrect: NSL had not improperly changed or increased the interest or fees on C.B.'s student loans and, to the extent any fees or interest changes were incurred, these were made consistent with the terms of his loans and with such notice as was required.

334.   This letter also falsely represented that it was sent from C.B.  In fact, it was sent by Biancone fraudulently impersonating C.B.

335.   Over the next several months, C.B. maintained a log of calls purportedly received from NSL.

336.   Johnson and/or Biancone advised C.B. to maintain this call log.

337.   This call log was maintained in a format provided by Johnson and/or Biancone.

338.   On a regular basis, C.B. provided Biancone with information regarding the number of calls he had received.

339.   At some time in 2016, Biancone and Johnson referred C.B. and T.S. to Ryan Lee.

340.   In or around November 2016, Lee and his co-counsel filed an arbitration demand on behalf of C.B. and T.S. against NSL alleging claims arising under the TCPA.

341.   In the course of that arbitration, C.B. was deposed under oath on April 21, 2017.

342.   At that deposition, C.B. testified under oath that when he spoke with an NSL agent on October 11, 2015 he was not told what to say by Biancone or Johnson and did not use a script.

343.   At that deposition, C.B. testified under oath that Johnson and Biancone had not discussed the possibility of lawsuits or legal recoveries from NSL as a means to eliminate his debt.

344.   At that deposition, C.B. testified under oath that nobody told him to track calls received from NSL and that he did not provide that information to Biancone.

345.   At that deposition, C.B. testified under oath that Johnson did not keep track of calls that C.B. received.

346.   At that deposition, C.B. testified under oath that he did not learn that he could recover under the TCPA until after he was referred to Lee and another attorney and that Biancone and Johnson never discussed the TCPA or the possibility of using phone calls to get money from NSL.

347.   All of the statements referred to in paragraphs 342–346 were false.

348.   It is clear that C.B. falsely testified that he was not told to contact NSL or what to say because he and T.S. plainly read from the same script that had been provided to other clients of the Scheme and described above in paragraph 56.

349.   C.B. falsely testified that Johnson and Biancone had not discussed the possibility of lawsuits or legal recovery or of using phone calls to get money from NSL because Johnson and Biancone both advertised this service specifically and regularly discussed it with all of their clients.

350.   C.B. falsely testified that he did not provide call log information to Johnson or Biancone because he later contradicted himself and admitted that he did, in fact, provide call information to Biancone on a regular basis and, in any event, his call logs were kept in a format

46

that was provided by Biancone and Johnson and matched that used by other clients of the Scheme.

351.    These fraudulent statements were induced by Lee for the purpose of misleading the arbitrator into thinking that the Scheme did not exist because Lee feared that disclosure of the Scheme would compromise its ability to prevail on behalf of C.B. and T.S.

352.    These fraudulent statements were also made to conceal The Law Offices of Ryan Lee's participation in improper fee-sharing agreements with non-lawyers.

## **S.I.**

353.    S.I. was a borrower of a student loan serviced by NSL.

354.    S.I.'s cousin, E.D., cosigned that loan.

355.    S.I. was referred to Johnson while exploring student loan relief options.

356.    On or about May 26, 2015, S.I. had a conversation with a call-center agent for NSL.

357.    During that conversation, S.I. asked NSL to "please stop calling me and correspond with me in writing from this point forward," and provided her telephone number. She then said, "please do not call me at work because my employer prohibits me from receiving calls."

358.    On or about August 7, 2015, a letter was sent via the USPS to NSL purportedly from S.I. and stating that she had not received requested billing statements and claiming that the interest rate and/or fees on her student loans had been improperly increased without notice.  The letter requested a wealth of information for the purported purpose of "audit[ing S.I.'s] most recent statement and obtain[ing] clarification."

359.     The letter also claimed that if a satisfactory response was not received, S.I. would unilaterally send a check intended to resolve any outstanding debt.

360.     With the exception of the account number, the address and name of the alleged signatory of the letter, and portions of the introductory paragraph, this letter was identical in content and form to the letter that NSL received from Kyle Bates on March 12, 2015 and described above in paragraphs 138–139.

361.     The substance of this letter was materially false and incorrect: NSL had not improperly changed or increased the interest or fees on S.I.'s student loans and, to the extent any fees or interest changes were incurred, these were made consistent with the terms of his loans and with such notice as was required.

362.     This letter also falsely represented that it was sent from S.I.  In fact, it was sent by one or more of the Recruiting Defendants fraudulently impersonating S.I.

363.     At some point, S.I. and E.D. were referred to K&M by the Recruiting Defendants.

364.     On or about December 3, 2015, K&M, through local counsel, filed a lawsuit on behalf of E.D. against NSL in the United States District Court for the Northern District of Georgia alleging claims arising under the TCPA.

365.     On January 6, 2016, the court stayed and administratively closed that case for the parties to arbitrate their dispute by the consent of the parties.

366.     On or about January 12, 2016, K&M filed an arbitration demand on behalf of E.D. against NSL alleging claims arising under the TCPA.  Subsequently, K&M amended E.D.'s claim against NSL to include S.I. as a co-claimant.

367.     An in-person arbitration hearing was held on April 7, 2017 in Grand Rapids, Michigan.

48

368.    At that hearing, S.I. testified under oath that she had not been given a script to read when speaking with NSL.

369.    This testimony was false because S.I. plainly used the same script that the Recruiting Defendants had provided to other clients of the Scheme.

370.    At the hearing, S.I. was shown a copy of the August 7, 2015 letter.

371.    She initially testified it was a letter that she had received from NSL.

372.    After S.I. was shown that the letter bore her signature, she testified that the letter was, in fact, sent by her.  S.I. was asked if a form had been given to her for the August 7, 2015 letter.  In response, S.I. testified under oath that it was "something that [she] would have probably Googled.  I'm not even going to lie to you."

373.    S.I. was lying because the letter was identical in form and content to letters known to have been provided by the Recruiting Defendants to their clients.

374.    When confronted with evidence that the letter matched other letters provided by Johnson, S.I. admitted that she had spoken to Johnson about it.

375.    Upon information and belief, S.I. testified falsely about the involvement of the Recruiting Defendants in her case because she was advised to do so by Defendants to conceal the Scheme.

376.    Upon information and belief, this concealment was attempted, in part, because Defendants feared that revealing the existence of the Scheme could jeopardize S.I.'s case.

## Court Proceedings, False Denials, and Exposure of the Scheme

377.    In or around May 2015, NCAI filed a lawsuit in California state court against K&M, Biancone, Johnson, and others, alleging that K&M had failed to remit moneys owed to NCAI for referrals made to K&M (the "California Case").

378.     Despite having repeatedly denied any relationship among them, K&M, Johnson, and Biancone initially were represented by the same counsel and jointly filed a demurrer on May 14, 2015.

379.     Biancone subsequently withdrew from this joint defense relationship and represented himself.

380.     On June 2, 2016, NCAI filed its Third Amended Complaint in the California Case (the "TAC").

381.     NCAI's TAC openly describes the Scheme by which "violations" were amassed until "criteria" necessary to fully extinguish customers' debt were achieved.

382.     This description refers to Defendants' attempts to manufacture TCPA claims to create sufficient statutory damages to wipe out clients' student loan debt.

383.     According to NCAI, the Scheme was initiated by K&M and other Defendants, who sought NCAI's help "to settle K&M's client's debts with various creditors, and K&M would monitor violations and handle litigation if necessary."

384.     Separate from the other Defendants (who demurred), Biancone filed an answer to the TAC *pro se*.

385.     In his answer, Biancone repeatedly acknowledged a relationship between himself and NCAI, including that his company, MB Consulting, had a "marketing services agreement" with NCAI.

386.     Nevertheless, Biancone denied any relationship with Johnson or K&M.

387.     These denials were false and fraudulent as demonstrated by the extensive evidence showing collaboration between Biancone and Johnson and K&M.

388.     As exhibits to the TAC, NCAI provided documentary support for its relationship with K&M.

389.     One such piece of support was an addendum to NCAI's customer agreement providing for K&M to pay referral fees to NCAI.

390.     This addendum was drafted by Ryan Lee during the time that he was employed by K&M.

391.     In an email to an officer of NCAI, Lee represented that he was "working with Doug Johnson" and suggested that NCAI add language into its client agreements reading, in part, "You hereby authorize Krohn & Moss to forward your settlement proceeds to be distributed to National Consumer Advocates, Inc. to satisfy your contractual agreement with them."

392.     Upon information and belief, this agreement violated Illinois and California rules of professional conduct that prohibit a lawyer from sharing fees with a nonlawyer.  *See* Ill. Rule of Prof'l Conduct 5.4; Cal. Rule of Prof'l Conduct 1-320; *see also* Ill. Rule 7.2 (prohibiting referral fees); Az. Rules of Prof'l Conduct 5.4 (prohibiting fee sharing with nonlawyer), 7.2 (prohibiting referral fees).

393.     According to NCAI, Lee, on behalf of K&M, also spoke with Johnson, Biancone, and an officer of NCAI to ensure that "everyone would 'be paid' and everything they were doing was legitimate."

394.     NCAI also provided a list of customers that it had referred to K&M.

395.     Nevertheless, K&M has repeatedly denied any relationship with NCAI, Johnson, or Biancone in court filings.

396.     These denials are false and fraudulent in light of clear documentation of a relationship among all of the Defendants.

**Internal Disputes of the Scheme Participants**

397.   K&M had filed a lawsuit on behalf of Dana DiStasi against NSL in the United States District Court for the Northern District of New York on January 12, 2015, captioned *DiStasi v. Navient Solutions, Inc.*, No. 1:15-cv-00038-GTS-ATB (N.D.N.Y.).

398.   On May 4, 2015, NCAI filed a Notice of Lien in that case asserting that it was entitled to the proceeds of DiStasi's settlement with NSL.

399.   In response to the Notice of Lien, K&M filed a motion to strike the lien denying any relationship between DiStasi and NCAI and purporting to have no idea what the potential basis could be for any purported lien.

400.   In fact, though it is possible that NCAI had not perfected a lien with respect to the settlement proceeds, the motion nevertheless was false and misleading because it denied the longstanding relationship between K&M and NCAI involving the referral of TCPA clients in exchange for a share of settlement proceeds.

401.   Further, this motion was false and misleading—if not frivolous—insofar as it denied that K&M had a written contract with NCAI regarding the payment of fees for the referral of DiStasi.

402.   K&M also had filed a lawsuit on behalf of Sarah Swartzbeck against NSL in the United States District Court for the Western District of Pennsylvania on June 12, 2014, captioned *Swartzbeck v. Navient Solutions, Inc.*, No. 2:14-cv-00746-JFC (W.D. Pa.).

403.   Swartzbeck was listed as a client of NCAI in NCAI's TAC in the California Case.

404.   On May 1, 2015, NCAI filed an identical Notice of Lien in the *Swartzbeck* case.

405.   K&M's response was functionally identical to its response in the *DiStasi* case, falsely denying any knowledge of or relationship with NCAI and denying the existence of a written contract.

406.   After these efforts to obtain payment from K&M did not succeed, NCAI resorted to contacting counsel for NSL directly and demanding payment.

407.   In several cases, NSL has received letters from NCAI claiming a right to settlement proceeds in TCPA cases.

## Further Allegations of Racketeering Activity

408.   As set forth above, Defendants have conspired to engage and have engaged in a pattern of racketeering activity for the purpose of fraudulently extracting settlements from NSL and conducting litigation against NSL through fraud.

409.   Defendants made numerous fraudulent and false statements through the mails in letters sent via the USPS to NSL purportedly on behalf of the Scheme's clients.

410.   These letters were sent by the Recruiting Defendants for the purpose of misleading NSL into believing that student loan borrowers were acting alone to legitimately challenge the terms of their student loans.

411.   The letters also sought to deceive NSL by preventing it from learning of the existence of the Scheme.

412.   NSL reasonably relied upon these misrepresentations because it had no reason to suspect that its customers would be lying to it about the status of their loans.

413.   Defendants made numerous fraudulent and false statements through the wires, primarily in briefs and other court papers submitted through electronic mail.

414.    These fraudulent and false statements concealed facts regarding the existence and conduct of the Scheme.

415.    This information was concealed for the purpose of deceiving NSL and various courts and arbitrators into believing that the Scheme did not exist.

416.    NSL acted in reasonable reliance upon these misrepresentations and did not initially suspect the existence of the Scheme.

417.    These statements also sought to induce the reasonable reliance of courts and arbitrators in convincing them that the Scheme did not exist so as to prevent adverse rulings against K&M, Lee, and their clients.

418.    Courts, arbitrators, and NSL reasonably relied upon these statements because they were made by attorneys subject to a duty of candor.

419.    As a proximate result of Defendants' misrepresentations, concealment of the Scheme, and inducement of false testimony, NSL was deprived of the opportunity to raise colorable defenses and adjudicators were deprived of information necessary to render a fully informed decision.

420.    As a result of this reliance, NSL suffered real and significant damages in the form of damages and settlement costs as well as attorneys' fees incurred as a result of the Scheme and the concealment thereof.

**FIRST CAUSE OF ACTION**
*Claim Against Defendants Biancone and Johnson Under*
*Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)*

421.   NSL repeats and incorporates by reference paragraphs 1–420 of the Complaint.

422.   NSL is a "person" within the meaning of 18 U.S.C. § 1964(c).

423.   Biancone and Johnson are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

424.   Defendants operate as an association in fact that is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise has, at all relevant times, been engaged in activities to carry out the Scheme that are in and affect interstate commerce.

425.   At all relevant times, Defendant Biancone has been employed by or associated with MB Consulting and NCAI.

426.   At all relevant times, Defendant Johnson has been employed by or associated with NCAI.

427.   Defendant Biancone has participated in the affairs of MB Consulting and Defendants Biancone and Johnson have participated in the affairs of NCAI through a pattern of racketeering activity within the meaning of §§ 1961(1)(B), 1961(5), and 1962(c), namely the Scheme as described more fully above and including multiple related instances of mail fraud in violation of 18 U.S.C. § 1341.  Specifically, Biancone and Johnson have written, fraudulently signed, and sent numerous letters to NSL fraudulently purporting to come from NSL customers.

428.   In furtherance of the fraudulent Scheme, Defendants Biancone and Johnson have utilized the resources of MB Consulting and of NCAI to carry out the pattern of racketeering activity in furtherance of the Scheme.

429. By reason of the violation of 18 U.S.C. § 1962(c) committed by Defendants Biancone and Johnson through this pattern of racketeering activity in furtherance of the Scheme, including the multiple related instances of mail fraud described above, NSL was injured within the meaning of 18 U.S.C. § 1964(c) in an as-yet-undetermined amount to be proved at trial.

430. By reason of Defendants Biancone and Johnson's violations as specified above, NSL is entitled to three times its actual damages pursuant to 18 U.S.C. § 1964, with interest from the date of loss and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION
*Claim Against Defendants Krohn, Hill, and Lee Under*
*Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)*

431. NSL repeats and incorporates by reference paragraphs 1–420 of the Complaint.

432. NSL is a "person" within the meaning of 18 U.S.C. § 1964(c).

433. Defendants Krohn, Hill, and Lee are "persons" within the meaning of 18 U.S.C. §§ 1961(c).

434. The Defendants have formed an association in fact that is an "enterprise" within the meaning of 18 U.S.C. §1961(4), which enterprise has, at all relevant times, been engaged in activities that are in and affect interstate commerce in carrying out the Scheme.

435. At all relevant times, Defendants Krohn and Hill have been employed by or associated with K&M. Krohn has principally directed K&M's affairs.

436. At all relevant times, Defendant Lee has been associated with either K&M or the Law Offices of Ryan Lee.

437. Defendants Krohn, Hill, and Lee have participated in the affairs of K&M and, in Lee's case, of the Law Offices of Ryan Lee through a pattern of racketeering activity within the meaning of §§ 1961(1)(B), 1961(5), and 1962(c), namely and as described more fully above,

multiple related instances of wire fraud in violation of 18 U.S.C. § 1343 and witness tampering in violation of 18 U.S.C. § 1512.  Specifically, Defendant Hill has signed or caused to be signed and sent or caused to be sent through the wires multiple fraudulent briefs and filings that induced NSL to settle TCPA claims and/or deceived adjudicators on the facts of pending cases. Defendants Krohn, Hill, and Lee also have by corrupt means induced numerous witnesses to testify falsely about the details of the Scheme.

438.    In furtherance of the fraudulent Scheme, Defendants Krohn, Hill, and Lee have utilized the resources of K&M and the Law Offices of Ryan Lee to carry out the pattern of racketeering activity in furtherance of the Scheme.

439.    By reason of the violation of 18 U.S.C. § 1962(c) committed by Defendants Krohn, Hill, and Lee through this pattern of racketeering activity in furtherance of the Scheme, including the multiple related instances of wire fraud and witness tampering described above, NSL was injured within the meaning of 18 U.S.C. § 1964(c) in an as-yet-undetermined amount to be proved at trial.

440.    By reason of Defendants Krohn, Hill, and Lee's violations as specified above, NSL is entitled to three times its actual damages pursuant to 18 U.S.C. § 1964, with interest from the date of loss and reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
*Claim Against All Defendants for Conspiracy to Violate*
*Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d)*

441.    NSL repeats and incorporates by reference paragraphs 1–420 of the Complaint.

442.    NSL is a "person" within the meaning of 18 U.S.C. § 1964(c).

443.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(a).

444.    Defendants have formed an association in fact that is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a), which enterprise has, at all relevant times, been engaged in activities that are in and affect interstate commerce in carrying out the Scheme.

445.    Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) in furtherance of the Scheme as described above, in violation of 18 U.S.C. § 1962(d).

446.    Upon information and belief, Defendants knew that they were engaged in a conspiracy to commit the predicate acts, they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

447.    Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Scheme's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

448.    Each Defendant knew about and agreed to facilitate the Scheme to manufacture lawsuits against NSL.  It was part of the conspiracy that Defendants and their co-conspirators would commit a pattern of racketing activity in the conduct of the Scheme, including the acts of racketeering set forth above.

449.    The Defendants took overt acts in furtherance of the Scheme (as described in paragraphs 104–420 above) and to conceal the existence of the Scheme from NSL and others.

450.    By reason of the violation of 18 U.S.C. § 1962(d) committed by Defendants, NSL was injured within the meaning of 18 U.S.C. § 1964(c) in an as-yet-undetermined amount to be proved at trial.

451.   By reason of Defendants' violations as specified above, NSL is entitled to three times its actual damages pursuant to 18 U.S.C. § 1964, with interest from the date of loss and reasonable attorneys' fees.

### FOURTH CAUSE OF ACTION
*Claim Against All Defendants for Common Law Fraud*

452.   NSL repeats and incorporates by reference paragraphs 1–420 of the Complaint.

453.   The Recruiting Defendants engaged in a fraudulent scheme to profit at the expense of NSL and student loan borrowers.  As described above, the Recruiting Defendants instructed student loan borrowers to make payments to them based on the false representation that the Recruiting Defendants would use the funds to settle the borrowers' obligations to NSL. Those representations were false and the Recruiting Defendants simply kept the money.

454.   In conjunction with the Recruiting Defendants, the Law Firm Defendants further instructed student loan borrowers to lie to NSL in an effort to manufacture claims under the TCPA.

455.   The Law Firm Defendants, Hill, Krohn, and Lee falsely represented that the Scheme did not exist, that their clients had not received instruction on what to say on the phone with NSL, and that no agreement or association existed between K&M and the Recruiting Defendants.

456.   These false statements were material because they went to the strength of legal cases brought by the Law Firm Defendants against NSL as well as to the existence of certain defenses.

457.   These false statements were made intentionally and knowingly because the Law Firm Defendants, Krohn, Hill, and Lee were aware of the existence of the Scheme, including that

their clients were instructed by the Recruiting Defendants in dealings with NSL and the fact that

K&M had a contractual relationship with the Recruiting Defendants.

458.    These false statements were intended to mislead because the Law Firm

Defendants believed that concealing the Scheme was necessary to achieve lucrative settlements

and to conceal certain professional ethics violations.

459.    As a direct and proximate result of the Defendants' fraudulent statements and

Scheme, NSL agreed to pay settlements to clients of K&M and/or was required to litigate or

arbitrate claims brought by K&M at considerable expense.

## FIFTH CAUSE OF ACTION
*Claim Against Recruiting Defendants for Tortious Interference with Contract*

460.    NSL repeats and incorporates by reference paragraphs 1–420 of the Complaint.

461.    NSL had entered into a valid promissory note with each and every client of the

Scheme.

462.    Each of these promissory notes memorialized a valid and binding agreement to

repay a student loan that had been disbursed.

463.    Each of the Recruiting Defendants was aware of the existence of these promissory

notes.  In fact, the Recruiting Defendants—and specifically Biancone, Johnson, and affiliated

entities—advertised that they could help potential customers with existing, valid contract

obligations relating to student loan debt.

464.    The Recruiting Defendants interfered with these repayment obligations by

inducing the Scheme's clients to route payments to NCAI or other entities affiliated with the

Recruiting Defendants instead of paying those funds to NSL.

465.    As a direct and proximate result of this interference, NSL was denied payments

that it was owed on valid and outstanding student loans.

466.     As a further result of this interference, NSL wrote off or wrote down all or part of outstanding student loans, further reducing the value of NSL's loan portfolio.

## PRAYER FOR RELIEF

WHEREFORE NSL prays that judgment be entered in its favor against each and every Defendant, jointly and severally, as follows:

1.     Compensatory damages for legal settlements, attorneys' fees incurred, and lost loan value or revenues, in an amount to be determined at trial;

2.     Trebling of compensatory damages pursuant to 18 U.S.C. § 1964(c);

3.     Punitive damages in an amount to be determined at trial;

4.     Costs and reasonable attorneys' fees as provided for by 18 U.S.C. § 1964(c) and any other applicable law;

5.     Pre- and post-judgment interest;

6.     Such other damages and other or further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury in this Court with respect to all issues so triable.

DATED:  October 18, 2017                    Respectfully submitted,


                                            /s/ Jeffrey R. Hamlin
                                            Jeffrey R. Hamlin (Va. Bar No. 46932)
                                            George R. Calhoun V (*pro hac vice* forthcoming)
                                            James M. Trusty (*pro hac vice* forthcoming)
                                            IFRAH PLLC
                                            1717 Pennsylvania Avenue NW
                                            Suite 650
                                            Washington, DC 20006-2004
                                            (202) 524-4140 – Tel.
                                            (202) 524-4141 – Fax
                                            jhamlin@ifrahlaw.com
                                            george@ifrahlaw.com
                                            jtrusty@ifrahlaw.com

                                            *Counsel for Plaintiff Navient Solutions, LLC*